# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| PATRICK SCHULTZ, an individual; VELVETTE SKAGGS, an individual; THE UTAH ASSOCIATION FOR THE DEAF, a Utah non-profit corporation; and DOES I-X individuals,<br><br>       Plaintiffs,<br><br>v.<br><br>UTAH COUNTY, a Utah municipality; PROVO CITY, a Utah municipality; JIM TRACY, Utah County Sheriff, as an individual and in his official capacity; DAVID BOLDA, Provo City Interim Chief of Police, as an individual and in his official capacity; OFFICER MATTHEW HIGLEY, as an individual in his official capacity; OFFICER VAN WAGONER, as an individual and in his official capacity; and ROES I-IX, as individuals and in their official capacities.<br><br>       Defendants. | **MEMORANDUM DECISION AND ORDER REGARDING DEFENDANTS UTAH COUNTY, OFFICER MATTHEW HIGLEY AND SHERIFF JIM TRACY'S MOTION FOR SUMMARY JUDGMENT DISMISSAL OF ALL CLAIMS ASSERTED IN PLAINTIFFS' FIRST AMENDED COMPLAINT AND MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS OFFICER REED VANWAGONER, PROVO CITY, AND DAVID BOLDA**<br><br><br>Case No. 2:11-cv-00274-DN<br><br>District Judge David Nuffer |

       Defendants Sergeant Higley, Sheriff Tracy, and Utah County's (hereinafter "Defendants") Motion for Summary Judgment Dismissal of All Claims Asserted in Plaintiffs' First Amended Complaint ("Defendants' Motion for Summary Judgment")[1] and Defendants Officer Reed VanWagoner, Provo City, and David Bolda's (hereinafter "Co-Defendants'") Motion for Summary Judgment ("Co-Defendants' Motion for Summary Judgment"),[2] joined by Defendants[3] was heard March 18, 2013. The court's decision was announced at that hearing.

---

[1]   Docket no. 33, filed March 8, 2012.
[2]   Docket no. 45, filed May 22, 2012.
[3]   Docket no. 50, filed July 20, 2012.

The parties, as directed by the court, submitted a proposed order which the court has carefully reviewed and edited.

## BACKGROUND[4]

**A. Parties.**

1. Plaintiffs brought this action seeking compensatory, injunctive, and declaratory, damages from Defendants in connection with an event that occurred on February 21, 2010.[5]

2. Plaintiff Patrick Schultz ("Plaintiff Schultz") is a forty-six (46) year old male individual who resides in Provo, Utah. Plaintiff Schultz is deaf.[6]

3. Plaintiff Velvette Skaggs ("Plaintiff Skaggs") is a thirty (30) year old female individual who also resides in Provo, Utah. Plaintiff Skaggs is deaf.[7]

4. Plaintiff The Utah Association For The Deaf ("UAD"), is a Utah non-profit corporation "organized with the purpose of helping to eliminate discrimination against individuals who are Deaf. …"[8]

---

[4]     The citations in this Order are to the Defendants' Memorandum in Support of Summary Judgment ("Supporting Memorandum") filed on March 8, 2012, docket no. 34. The court made redactions and changes to that Statement of Undisputed Material Facts in a document circulated to counsel on the morning of March 18, 2013 and subsequently discussed by the court at the hearing. The court instructed the parties as to which facts were material and undisputed. Those changes are reflected in this order.

[5]     *See* First Amended Compl. Pg. 7, docket no. 22-1, filed November 29, 2011; *See also* Prayer for Relief.

[6]     *See* First Amended Compl. ¶ 12. Defendants also asserted that additional facts related to Plaintiff Schultz's prior interactions with police officers and specifically Utah County should be considered. However, to the extent that information was not known to the Defendant officers prior to knocking on Plaintiffs' front door, Plaintiffs' assertion that the information was not relevant was proper and the court did not consider that background information.

[7]     *See* First Amended Compl. ¶ 13.

[8]     *See* First Amended Comp. ¶ 14.

5.  Plaintiffs named the following Defendants in their First Amended Complaint: (a) Utah County; (b) Provo City; (c) Jim Tracy; (d) David Bolda; (e) Officer Matthew Higley; (f) Officer Reed VanWagoner; and, (g) Roes I-IX.[9]

6.  Defendant Utah County is organized and existing under the laws of the State of Utah and is a political subdivision thereof.[10]

7.  Defendant Sheriff Tracy has been the Sheriff for the Utah County Sheriff's Office for nine (9) years and has been with the Utah County Sheriff's Office for approximately thirty-four (34) years.

**B.  Utah County's Policy and Training.[11]**

8.  At the time of these events, Utah County Sheriff's Office had Policy 5/330.00 – Interaction with the Hearing Impaired[12] in effect:

---

[9]    *See* First Amended Comp., ¶¶ 17-23.

[10]   *See* Defendants' Answer, at ¶ 17.

[11]   Plaintiffs did not dispute the facts regarding Sergeant Higley's background or the training provided to him by Utah County, but did question their relevance, and therefore the court struck ¶¶ 11, 14-18, from the Statement of Undisputed Material Facts.

[12]   28 C.F.R. § 35.160(b)(1). The ADA defines "auxiliary aids and services" to include "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 42 U.S.C. § 12102(1)(A). The DOJ regulations provide that "auxiliary aids and services" include, among other things, "[q]ualified interpreters" and "telecommunications devices for deaf persons (TDD's)." 28 C.F.R. § 35.104(1). Further, the Appendix to DOJ Regulation § 35.160 states that "[t]he public entity shall honor the [disabled individual's] choice [of auxiliary aid] unless it can demonstrate another effective means of communication exists or that use of the means chosen would not be required under § 35.164." 28 C.F.R. pt. 35, app. A; *see also id.* § 35.160(b)(2) ("In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities."). The ADA's "reasonable modification" principle, however, does not require a public entity to employ any and all means to make auxiliary aids and services accessible to persons with disabilities, but only to make "reasonable modifications" that would not fundamentally alter the nature of the service or activity of the public entity or impose an undue burden.

The hearing impaired will be extended every opportunity to file a report or respond when considered a suspect or subject in a criminal case. The intent of this policy is to ensure effective communication with persons with hearing impairments. The individual with the hearing impairment should be given their choice of auxiliary aids and services and that choice should be honored whenever possible. The ultimate decision, however, rests with Sheriff's Office deputies who must justify their decision if another method of communication is chosen.[13]

9.      At the time of these events, the Utah County Sheriff's Office had Policy 5/331.00

– Interviewing/Interrogating Subjects with a Hearing Impairment in effect:

If an interview with a hearing impaired subject is necessary to establish probable cause to make an arrest, an interpreter must be provided if written communication is ineffective. When the services of an interpreter are required to ensure effective communication, the interview, and possibly the arrest, must be postponed until the deputy can make arrangements for an interpreter.[14]

If a deputy cannot effectively inform the subject of the Miranda Rights without the use of an interpreter, the deputy must secure the services of an interpreter to communicate accurately the warnings to the subject prior to any interrogation. A deputy can proceed with the interrogation using a note pad only if: 1. exigent circumstances do not permit a delay in the interrogation of the subject; 2. an interpreter cannot be located within a reasonable period of time; AND 3. written communication between the deputy and the subject is effective in conveying an understanding of the Miranda rights.

10.     At the time of these events, Utah County Sheriff's Office had Policy 5/332.00 –

Issuance of Non-Criminal Citations to Hearing Impaired in effect:

If an individual without a hearing impairment would have been issued a non-criminal citation without having been questioned by a deputy, then a suspect with a hearing impairment in the same situation does not need to be provided with an interpreter. However, if the deputy is unable to convey to the violator the nature of the infraction by communicating on a note pad or by using another means of

*Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1082-1084 (11th Cir. 2007) (internal citations omitted).

[13]      *See* Defendants Utah County, Officer Higley, and Sheriff Tracy's Initial Disclosures, UC 0054, excerpts of which are attached as Exh. A to Defendants Utah County, Officer Matthew Higley and Sheriff Jim Tracy's Memorandum in Support of Motion for Summary Judgment Dismissal of all Claims Asserted in Plaintiffs' First Amended Complaint (Supporting Memorandum), docket no. 34, filed March 8, 2012.

[14]      *See* Defendants Utah County, Officer Higley, and Sheriff Tracy's Initial Disclosures, UC 0054, excerpts of which are attached as Exh. A to the Supporting Memorandum.

communication, the deputy should use their discretion as to whether to call an interpreter to the scene or whether to issue a warning rather than a citation.

11. In addition, the Utah County Sheriff's Office had a specific policy prohibiting against biased-based policing, under Policy 5/102.00 - <u>Prohibition Against Biased-Based Policing</u> in effect at the time of these events:

> Deputies of the Utah County Sheriff's Office are expressly prohibited from engaging in biased-based policing activities. Deputies will not discriminate against any person. Any arrest, detention, interdiction, asset seizure or forfeiture, or other law enforcement action based in whole or in part on the actual or perceived race, ethnicity, color, national origin, gender, age (except in the case of juvenile offenses), religion, culture, disability, sexual orientation, economic status, or other trait of a person or group is strictly forbidden unless such trait is a part of an identifying description of a specific suspect for a specific crime. Utah State law (Utah Code Annotated) and federal constitutional law applying to Utah specifically prohibits reliance by a peace officer and/or Deputy Sheriff upon the race, ethnicity or national origin of a person as a factor in initiating action when the race, ethnicity or national origin of the person is not part of an identifying description of a specific suspect for a specific crime. The Sheriff's Office is committed to observing, upholding, and enforcing all laws relating to the individual rights of all persons, guaranteeing everyone equal treatment under the law. …[15]

12. Sergeant Higley's written communications with Plaintiff Schultz and Plaintiff Skaggs was consistent with the Utah County Sheriff's Department's policies pertaining to interactions with the deaf or hearing impaired as of February 21, 2010.

13. Further, reports from the Utah County Sheriff's Office ("Reports") reflect that there was ongoing communication between deaf or hearing-impaired individuals and the Utah County Sheriff Office's deputies or employees, on or before February 21, 2010. The Reports indicate that officers of the Utah County Sheriff's Office, on numerous occasions, have assisted or set up communications with TDD or TTY phones at the jail, communicated with translators, and provided services to accommodate deaf or hearing impaired individuals, when taking deaf or

---

[15] *See* Defendants Utah County, Officer Higley, and Sheriff Tracy's Initial Disclosures, UC 0052, excerpts of which are attached as Exh. A to the Supporting Memorandum.

hearing impaired individuals into custody, or communicating with deaf or hearing impaired individuals when aiding them with their questions or needs. Before February 21, 2010, none of those interactions resulted in a lawsuit.[16]

**C.      Thirty-Day Notice to Vacate for Nuisance that Plaintiffs Received Seven (7) Months *Before* the Incident at Hand.**

14.     On July 29, 2009, well before February 21, 2010, Plaintiffs were issued a thirty-day eviction notice to vacate for nuisance by the Lessor and Owner of the premises, Clayton Weaver, which stated the following:

> You have committed or permitted a nuisance because: ***Tenants have repeatedly disturbed the other tenants and neighbors with domestic disputes including violence, screeching, etc.  The Provo police have been to their apartment on at least three different occasions in the past two months to deal with such disturbances***.  You are required to vacate the premises within thirty[17] calendar days, counting weekends and holidays.[18]

15.     Prior to that eviction notice, Plaintiffs had executed a Tenant-Owner Lease Agreement regarding the property located at 411 East 300 South #1, Provo, Utah.  The Plaintiffs had agreed to a term of lease beginning on May 5, 2009, and ending on April 30, 2010, unless terminated in accordance with their agreement.[19]

16.     In their First Amended Complaint, Plaintiffs repeatedly allege that they "were subjected to eviction from their apartment shortly after the events of February 21, 2010.  A stated

---

[16]     *See* Defendants Utah County, Officer Higley, and Sheriff Tracy's Supplemental Initial Disclosures, UC 0055-0456, excerpts of which are attached as Exh. C to the Supporting Memorandum.

[17]     The form is actually a Three Day Notice to Vacate for Nuisance, but both at the top of the page, and in the middle of the page, the "Three" has been crossed out and replaced with "Thirty."

[18]     *See* Plaintiffs' Responses to Request for Production, attached as Exh. D to the Supporting Memorandum (emphasis removed and added in other pertinent parts).

[19]     *See* Plaintiffs' Responses to Request for Production, attached as Exh. D to the Supporting Memorandum.

reason for the eviction was the presence of police at the apartment. The eviction caused the Plaintiffs to incur real costs the sum of which is still being calculated."[20]

17.    Because Plaintiffs claimed that they were evicted due to the February 21, 2010, events in Defendants' First Set of Interrogatories and Requests for Production of Documents to Plaintiffs, Defendants made the following requests:

REQUEST NO. 11:    Copies of each and every eviction notice, letter or other communication that Plaintiffs received from the apartment manager for the apartment that 411 East 300 South #1, Provo, Utah 84606, or related to the eviction that allegedly occurred shortly after the matters complained of in the Complaint.

REQUEST NO. 12:    Copies of the pertinent lease in effect between Plaintiffs and the leasing entity for the apartment located at that 411 East 300 South #1, Provo, Utah 84606, on the night of the matters complained of in the Complaint.

REQUEST NO. 13:    Copies of each and every eviction notice, letter or other communication that Plaintiffs have ever received, jointly or separately, from an apartment manager related to an eviction from a residence, including the eviction notice for 411 East 300 South #1, Provo, Utah 84606.[21]

18.    In Plaintiffs' Answers and Responses to Defendant Utah County's First Set of Interrogatories and Requests for Production of Documents to Plaintiffs, Plaintiffs responded as follows to those requests:

Production No. 11:    The Notice of eviction is included as Production 11.
                                         …
Production No. 12:    A copy of the lease is provided as Production 12.
                                         …
Production No. 13:    The only eviction notice known to the Plaintiffs was produced in response to Request 11.[22]

---

[20]    *See* First Amended Comp. ¶ 61.

[21]    *See* Defendants Utah County, Officer Higley, and Sheriff Tracy's First Set of Interrogatories and Requests for Production of Documents to Plaintiffs, excerpts of which are attached as Exh. E to the Supporting Memorandum.

[22]    *See* Plaintiffs' Answers and Responses to Defendant Utah County's First Set of Interrogatories and Requests for Production of Documents to Plaintiffs, excerpts of which are attached as Exh. B to the Supporting Memorandum.

19.     Simply put, the only eviction notice produced by Plaintiffs was the one from July 29, 2009, seven (7) months before the events at hand, and attached as Exh. F to the Supporting Memorandum.  Plaintiffs' claims of being evicted as a result of the events on February 21, 2010, lack support.

**D.    The Homicide Investigation Unrelated to Plaintiffs that Started in the Early Evening of February 21, 2010.**

20.     At approximately 4:35 p.m., patrol deputies were called to Jolly's Ranch where a dead body had been found in Hobble Creek Canyon. When patrol deputies arrived they confirmed the person was obviously deceased.  The body was found next to a blue garbage collector, there were "drag" marks in the snow leading to the body, and one set of footprints leading away from the body.[23]

21.     The body lying in the snow was between a snowdrift and a dumpster.  The person was wearing a black "hoodie."  Once the "hoodie" was moved away from the person's face, it was determined that a power cord had been wrapped around the person's neck and strangulation marks were apparent. The deputies were also able to determine the victim was a Caucasian female.  She was wearing blue jeans, a black "hoodie," two black t-shirts under the hoodie, and brown slip-on shoes/boots. Her hands were duct-taped behind her back as well.  She appeared to be approximately between 25-35 years of age.  She also had hearing aids in each ear.  The victim did not have any other identification on her person, no cell phone, and no other identifying marks or visible tattoos.  Also, based on the clothing and observations, the deputies believed the victim

---

[23]     *See* Defendants Utah County, Officer Higley, and Sheriff Tracy's Supplemental Initial Disclosures, UC 0011-0015, excerpts of which are attached as Exh. C to the Supporting Memorandum.

had been sexually assaulted. Her bra was pushed up, her jeans were open, and there was a large amount of blood on her jeans around the vaginal and rectum area.[24]

22. After clearing the scene, Sergeant Higley responded to the Utah County Sheriff's Office to further assist in the investigation. Sergeant Higley was asked to make contact with Sergeant Reed VanWagoner with Provo City Police. Sergeant Higley took several photographs of the victim to Sergeant VanWagoner in an attempt to have him identify the victim but he could not.[25]

23. While with the Provo City officers, Sergeant Higley was contacted by Utah County Detectives and was assigned to complete welfare checks on female individuals that were known to be deaf or hearing impaired. These individuals included Sarah Christian Thompson, Velvette Skaggs, Cynthia Monteirth and Melanie Sperry.[26] Both Velvette Skaggs and Melanie Sperry resided in Provo, Utah. Pursuant to Sergeant Higley's report, the officers went to Velvette Skaggs' residence first.[27]

---

[24] *See* Defendants Utah County, Officer Higley, and Sheriff Tracy's Supplemental Initial Disclosures, UC 0011-0015, excerpts of which are attached as Exh. C to the Supporting Memorandum.

[25] *See* Defendants Utah County, Officer Higley, and Sheriff Tracy's Supplemental Initial Disclosures, UC 0018-0020, excerpts of which are attached as Exh. C to the Supporting Memorandum.

[26] *See* Defendants Utah County, Officer Higley, and Sheriff Tracy's Initial Disclosures, UC 0034, excerpts of which are attached as Exh. A to the Supporting Memorandum.

[27] *See* Defendants Utah County, Officer Higley, and Sheriff Tracy's Supplemental Initial Disclosures, UC 0018-0020, excerpts of which are attached as Exh. C to the Supporting Memorandum.

**E.   Events at Issue on the Evening of February 21, 2010 that Relate to Plaintiff Schultz and Plaintiff Skaggs.**

24.   Sergeant Higley went with Sergeant VanWagoner to the residence and attempted to contact Plaintiff Skaggs. After speaking with other tenants[28] and knocking on PlaintiffSkaggs' door, Plaintiff Schultz opened the door.[29]  Sergeant Higley communicated with Plaintiff Schultz by writing on a note pad.  Sergeant Higley expressed that they needed to physically see Plaintiff Skaggs. A written dialogue ensued, however Plaintiff Schultz would not let the officers enter the apartment to see Plaintiff Skaggs who Plaintiff Schultz claimed was sleeping at the time.[30]

25.   The record reflects that there were multiple written communications exchanged between Sergeant Higley and Plaintiff Schultz on the night of February 21, 2010, spread out on seven (7) of eight (8) pages.[31]  Those seven (7) pages reflected the following dialogue:

> [Sergeant Higley]:   Where is your wife?
>                      Asleep?

---

[28]   Defendants attached as Exh. A to their Supporting Memorandum, the police report of Sergeant Higley as well as a Declaration of Sergeant Higley attached as Exh. G.  The police report included the information told to Sergeant Higley by the tenant before he knocked on Plaintiffs' door. Sergeant Higley's police report specifically said:

> [Plaintiff Schultz] was very confrontational with Sgt. VanWagoner and I… There is a long history of domestic violence between Mr. Skaggs and Velvette Skaggs. One of the other tenants in the apartment building stated to Sgt. VanWagoner and I that she had not seen Velvette that day.  She also stated that she had only seen [Plaintiff Schultz] earlier that day returning to the apartment complex riding in the back of a white pickup truck.  We were also informed that Velvette and [Plaintiff Schultz] were often observed fighting and making "lots of noise."

*See* Defendants' Supporting Memorandum, Exh. A, UC 0019.   Any information regarding Schultz and Skaggs that was not known to the Officers prior to their arrival at the Plaintiffs' door is not relevant to the Motion.

[29]   Plaintiffs assert that Plaintiff Schultz answered the door at approximately 11:30 p.m. on February 21, 2010.  *See* First Amended Compl., ¶ 26, D.E. 22-1.

[30]   *See* Defendants Utah County, Officer Higley, and Sheriff Tracy's Initial Disclosures, UC 0035-37, excerpts of which are attached as Exh. A to the Supporting Memorandum.

[31]   *See* complete written exchange between Sergeant Higley and Plaintiff Schultz on February 21, 2010, docket no. 42-1, filed April 24, 2012.

|  |  |
|---|---|
|  | Here? |
|  | I need to see her. |
|  | Make sure she is Ok |
| [Plaintiff Schultz]: | Who call you? |
| [Sergeant Higley]: | Some one was found in Springville Canyon we don't know who she is. All we want is to see if she is here and we will leave. |
| [Plaintiff Schultz]: | Is Springville Canyon in Utah? |
|  | We were in Provo, Utah church from 1230 – 500 p.m then stay home all day? |
| [Sergeant Higley]: | I just need to see her |
| [Plaintiff Schultz]: | ~~You can't~~ |
|  | You have court order |
| [Sergeant Higley]: | I can get one but we are not leaving until we get to see her |
| [Plaintiff Schultz]: | Where court paper tell you come |
| [Sergeant Higley]: | All we need to do is see her. |
|  | Is she really here? |
| [Plaintiff Schultz]: | You have to contact my lawyer. |
| [Sergeant Higley]: | Ok we can do this the hard way you are not allowed to leave |
|  | You are coming out and we will get court paper |
| [Plaintiff Schultz]: | Why are you here? |
| [Sergeant Higley]: | We found some one that was hurt and we don't know who she is. |
| [Plaintiff Schultz]: | We have nothing ~~you~~ someone liar [sic] to you |
|  | Your business cards |
| [Sergeant Higley]: | I will get you one before we leave |
|  | We found some one hurt |
|  | Sit. |
|  | What is your wife's name |
| [Plaintiff Schultz]: | Velvette Skaggs |
| [Sergeant Higley]: | Thank you |

| [Sergeant Higley]: | Sgt. Matt Higley |
| | Utah County Sheriff's Office |
| | (801) 851-4011 |

All we want to do is find out who she is.
Sorry to bother you.
Thank you
We are checking everyone, not just you.[32]

26.     When Sergeant Higley wrote "you are coming out" Plaintiffs allege in their Opposition Memorandum that Plaintiff Schultz took that to mean that he and his wife were being arrested and Plaintiff Schultz went to get her.  Without writing anything on the notepad, Plaintiff Schultz turned to walk into his own apartment in order to wake up his wife. Plaintiff Schultz asserts that when he turned his back the officers entered his apartment (up until that point the officers had been standing outside the apartment at the front door).  Plaintiffs assert that the officers grabbed Plaintiff Schultz by the arms and forced him to sit in a chair inside the apartment and again pointed at the written question ("Where is your wife"). This continued for several minutes until the commotion woke Plaintiff Skaggs and she wandered out of the bedroom to find out what was going on.[33]

27.     At that time, the officers thanked Plaintiff Skaggs and Plaintiff Shultz, apologized for bothering them and left after Sergeant Higley gave Plaintiffs the last page of communication on the note pad which had his name and contact information on it. [34]

[28-30 omitted]

31.     Apart from this interaction, Sergeant Higley had no further contact with Plaintiffs.

---

32    [Docket no. 34-10](), filed March 8, 2012.
33    *See* First Amended Compl. ¶¶ 29-31, D.E. 22-1.
34    *See* Declaration of Matthew Higley, which is attached as Exh. G to the Supporting Memorandum.

## DISCUSSION

### A.     Summary Judgment Standard

"[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."[35] Under this standard, "a mere factual dispute will not preclude summary judgment; instead there must be a *genuine* issue of *material* fact."[36] When the Defendants' and the Plaintiffs' version of events clearly diverge, this court need not blindly accept Plaintiffs' one-sided version of the events, but rather it is the "factual matrix" most favorable to the Plaintiff that this court must consider.[37]

In other words, the non-moving party must provide evidence "such that a reasonable jury could return a verdict for the non-moving party."[38] This means the Plaintiffs must provide "significant probative evidence tending to support the complaint."[39] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[40]

Defendants assert that Sergeant Higley is entitled to summary judgment under the doctrine of qualified immunity regarding Plaintiffs' 42 U.S.C. § 1983 Deprivation of Constitutional Rights Claims.    The court addressed those claims last as related to these Defendants and so will proceed regarding the claims in the order that the court addressed them at the hearing on March 18, 2013.

---

[35]     *See* Rule 56(a), *Federal Rules of Civil Procedure*.

[36]     *See Cooperman v. David*, 214 F.3d 1162, 1164 (10th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (emphasis added).

[37]     *See Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003).

[38]     *See Cooperman*, 214 F.3d at 1164 (10th Cir. 2000).

[39]     *See First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 290 (1968).

[40]     *See Anderson*, 477 U.S. at 249-50 (citations omitted).

**B.** **Plaintiffs' Claims Against Utah County, Jim Tracy, Utah County Sheriff, and Officer Matthew Higley**

    *i.*     <u>*Plaintiff Utah Association for the Deaf's ("UAD") Claims Against Defendants*</u>

Defendants assert that Plaintiff UAD cannot assert a general claim on behalf of its association members in this case, particularly where each interaction the Defendants or Defendant-officers may have with UAD individual members may be different, requiring different and individualized proof which is consistent with the U.S. Supreme Court's holding in *Warth v. Seldin*:

> The present case, however, differs significantly as here an association seeks relief in damages for alleged injuries to its members. Home Builders alleges no monetary injury to itself, nor any assignment of the damages claims of its members. No award therefore can be made to the association as such. Moreover, in the circumstances of this case, the damages claims are not common to the entire membership, nor shared by all in equal degree. To the contrary, whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof. Thus, to obtain relief in damages, each member of Home Builders who claims injury as a result of respondents' practices must be a party to the suit, and Home Builders has no standing to claim damages on his behalf.[41]

Plaintiffs concede that the Association cannot seek separate monetary damages. Defendants also assert that while an association can seek injunctive relief there has been no demonstration or evidence produced by the individual Plaintiffs or by UAD that a pattern or practice of misconduct exists within Utah County to support any injunctive action being necessary. Plaintiffs offered no persuasive authority to refute *Warth v. Seldin*. Accordingly, Plaintiffs failed to meet their burden and UAD is dismissed as a party from this case.

---

[41]     *See Warth v. Seldin*, 422 U.S. 490, 515-516 (1975).

*Plaintiffs' Claims Against Utah County for Injunction and Damages for Violation of Title II of the ADA for Failure to Afford Effective Communication and Violation of Section 504 of the Rehabilitation Act as Stated Under Plaintiffs' First and Second Causes of Action*

Plaintiffs' First Cause of Action purports to state a claim for violation of Title II of the ADA, while Plaintiffs' Second Cause of Action addresses Section 504 of the Rehabilitation Act, against Utah County.

> Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132 (2006). … In an arrest context, courts have recognized two types of ADA claims under Title II:(1) wrongful arrest of a suspect based on his disability and not for any criminal activity, and (2) failure to make reasonable accommodation during a lawful arrest and investigation, causing the disabled person to suffer greater injury or indignity than other arrestees. … .[42]

Section 504 has the same standards as a violation of Title II of the ADA.

> The Rehabilitation Act was enacted some seventeen years before the ADA. Title II of the ADA and § 504 of the Rehabilitation Act are closely related, and to "the extent possible, [courts] construe similar provisions in the two statutes consistently."… Indeed, the statutes "share the same definitions of disability," id. at 433, and Title II of the ADA explicitly provides that "[t]he remedies, procedures, and rights" provided under § 504 of the Rehabilitation Act "shall be the remedies, procedures, and rights [that Title II of the ADA] provides to any person alleging discrimination on the basis of disability...." 42 U.S.C. § 12133.[43]

Defendants assert that *Tucker v. Tennessee*, 539 F.3d 526 (6th Cir. 2008) should be applied to the facts at hand. In *Tucker v. Tennessee*, the plaintiffs challenged the summary judgment that was granted in favor of the city police as it related to their arrest.  Plaintiffs alleged that despite their request, the City police failed to provide a qualified sign language interpreter The court held that the police were not providing a "service, program, or activity" to which the ADA applied, but even if they were, the plaintiffs "…failed to show any intentional denial of

---

[42] *See Paulone v. City of Frederick*, 718 F.Supp.2d 626, 633-636 (D.Md. 2010)(internal citations omitted).

[43] *See Paulone v. City of Frederick,* 787 F.Supp.2d 360, 369 (Md. 2011).

benefits solely because of their disabilities… Had the situation remained controlled, the officers were communicating effectively with all parties by using a pen and paper … Where, as it occurred in this case, officers are presented with exigent or unexpected circumstances, it would be unreasonable to require certain accommodations be made in light of the overriding public safety concerns."[44]

Plaintiffs assert that *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), is a "more applicable case."[45] In *Gorman v. Bartch*, a wheelchair bound arrestee brought a claim against the city police department, its officers and others, under the Rehabilitation Act and ADA, for injuries received when being transported in a police van that was not equipped with wheelchair restraints. While the appellate court found that the arrestee's allegations fell within the framework of both ADA provisions regarding public services and the Rehabilitation Act, the appellate court also found that the police officials were entitled to qualified immunity in their individual capacities from arrestee's claims because "it cannot be said that reasonable police officials in May of 1992 would have known that the actions alleged against the individual defendants in respect to the transportation of a disabled arrestee were subject to, and in violation of, Title II of the ADA or § 504 of the Rehabilitation Act."[46]

The court independently addressed the Tenth Circuit decision, *Gohier v. Enright*, 186 F.3d 1216 (10th Cir. 1999), referenced in an Eleventh Circuit Case[47] by Defendants in their Supporting Memorandum, which the *Tucker v. Tennessee* court found persuasive.

---

[44]    *See Tucker v. Tennessee*, 539 F.3d 526, 534-536 (6th Cir. 2008) (internal citations omitted).

[45]    *See* Plaintiffs Memorandum in Opposition to Defendants Utah County, Officer Matthew Higley and Sheriff Jim Tracy's Motion for Summary Judgment Dismissal of all Claims Asserted in Plaintiffs' First Amended Complaint (Plaintiffs' Opposition Memorandum), pg. 28, docket no. 41, filed April 20, 2012.

[46]    *See Gorman v. Bartch*, 152 F.3d 907, 915-916 (8th Cir. 1998).

[47]    *See Bircoll v. Miami-Dade County*, 480 F.3d 1072 (11th Cir. 2007).

The Eleventh Circuit noted that the Tenth Circuit "recognized the possibility that arrestees may be able to state an ADA claim based on police conduct during an arrest.[48] However, the Tenth Circuit ultimately left the theory of such a claim "an open question" in the circuit because the facts did not show a wrongful arrest based on a disability and the plaintiff made no claim that the police had failed to accommodate his disability during the arrest.[49]

Under *Gohier*, a police investigation could be considered a service. However, taking the evidence in the light most favorable to Plaintiffs as the non-moving party, Plaintiffs were not intentionally denied the benefit of participating in a service based on their disability, where there was no arrest, no documented written request for an interpreter by Plaintiff Schultz; Plaintiff Schultz provided no sworn affidavit stating otherwise; and the communication while perhaps difficult, was not ineffective, as it related to the communications exchanged between Plaintiff Schultz and Sergeant Higley on the evening of February 21, 2010. Further, Plaintiffs could not demonstrate what would have been different had an interpreter been present. Thus, Plaintiffs did not carry their burden on their causes of action against Utah County for Violation of Title II of the ADA Failure to Afford Effective Communication and Violation of Section 504 of the Rehabilitation Act, such that Plaintiffs' First and Second Causes of Action are dismissed against Utah County.

    iii.       *Plaintiffs' Claims Against Utah County for Violation of Title II, ADA and Section 504 for Disparate Treatment by Reason of Disability as Stated Under Plaintiffs' Third Cause of Action*

Plaintiffs assert that a disparate-treatment or disparate-impact claim is cognizable under the ADA against Utah County based on *Thompson v. Colorado*, 258 F.3d 1241, 1249 (10th Cir.

---

[48] *See Gohier*, 186 F.3d at 1220-21.
[49] *See id.* at 1221.

2011). Plaintiffs also referred to the Department of Justice, 1991 title II ADA regulation.[50] However, Plaintiffs failed to mention that Utah County does use qualified American Sign Language interpreters and there is no limitation demonstrated by Plaintiffs regarding any auxiliary aid or services that Utah County does not provide. In fact, there is nothing in support of Plaintiffs' claims that Defendants segregate their services from persons who are Deaf or have any type of hearing impairment and because Plaintiffs demonstrated no showing of need to be treated differently other than the treatment provided by Sergeant Higley on the evening at issue, Plaintiffs Third Cause of Action is dismissed against Utah County.

*iv.* *Plaintiffs' Claims Against Utah County for Violation of Title II, ADA – Discriminatory Policies Practices and Procedures as Well as Injunction and Damages for Violation of Title II, ADA–Discriminatory Administrative Methods as Stated Under Plaintiffs' Fourth and Fifth Causes of Action*

In Plaintiffs' Fourth and Fifth Causes of Action, Plaintiffs addressed violations under Title II of the ADA against Utah County based on claims that Utah County has discriminatory policies, practices, or administrative methods. Plaintiffs asserted that Utah County fails to provide interpreters and fails to provide training related to their employees regarding the ADA and Section 504, and that Plaintiffs' eviction was a result of Utah County's discriminatory policies.[51]

In response, Defendants addressed the training provided by Utah County to Sergeant Higley regarding the ADA, discrimination, and disabled individuals with documentation,[52] and also attached an eviction notice from seven months earlier to show that the eviction proceedings were not related to the events on February 21, 2010. Plaintiffs offered no evidence to the contrary.

---

[50]     *See* Plaintiffs' Opposition Memorandum, pgs. 20, 30.
[51]     *See* First Amended Comp. ¶¶ 72-90.
[52]     *See* Supporting Memorandum, ¶¶ 11, 14-18, 25-30.

Further, Plaintiffs failed to produce any evidence that there was a widespread pattern or practice of misconduct, deliberate indifference by the policy makers, or that Plaintiffs were specifically injured by any Utah County policy, practice, method or custom, such that Plaintiffs' claims failed under the *Monell* test.[53]  However, Defendants argued this only in their discussion of dismissal of Plaintiffs' Eighth Cause of Action and not as a separate section in their argument. Even though Defendants requested dismissal of all claims asserted in Plaintiffs' First Amended Complaint,[54] Defendants (in not including specific language of dismissal regarding "Plaintiffs' Fourth and Fifth Causes of Action" in their Supporting Memorandum) did not put Plaintiffs on clear notice or fully brief those two causes of action, such that Plaintiffs did not respond in their Opposition Memorandum, and therefore Defendants' Motion to dismiss Plaintiffs' Fourth and Fifth Causes of Action is denied.

> v.    *Plaintiffs' Claims Against Sergeant Higley and Sheriff Tracy as Individuals in Their Official Capacities for Violation of Plaintiffs' Constitutional Rights to Miranda Prior to Custodial Questioning and Attached Due Process Violations Under the Sixth And Fourteenth Amendments as Stated Under Plaintiffs' Seventh Cause of Action*

In their Seventh Cause of Action, Plaintiffs complain that Schultz was not given Miranda warnings.   Defendants assert that Plaintiff Schultz was neither a criminal suspect in custody or under the functional equivalent of a formal arrest when the officers interacted with him on the night of February 21, 2010, regarding the whereabouts of Plaintiff Skaggs.  *Chavez v. Martinez*, 538 U.S. 760 (2003), is directly on point.  In that case, the U.S. Supreme Court indicated that a sergeant's general questioning did not violate the plaintiff's due process rights , nor warrant liability under a 42 U.S.C. § 1983 action.  *Miranda* advice of rights was not required and Plaintiffs' evidence in support of their Seventh Cause of Action fails to support a violation of the Sixth or Fourteenth Amendment; therefore Plaintiffs' Seventh Cause of Action is dismissed.

---

[53]    *See Brown v. Whitman*, 651 F.Supp.2d 1216, 1227-1232 (D.Col.2009).
[54]    *See* docket no. 32, and docket no. 33.

###### vi.    *Plaintiffs' Claims Against Jim Tracy, Utah County Sheriff*

It is undisputed by all parties that Sheriff Tracy was not present during the interaction or involved in any way with the officers' interaction at the Plaintiffs' apartment on the evening of February 21, 2010.  Accordingly, Plaintiffs have failed to assert facts which would establish Sheriff Tracy's liability in any way and Sheriff Tracy is entitled to dismissal of all claims raised against him by Plaintiffs.

###### vii.    *Plaintiffs' Claims Against Utah County for Violation of Plaintiffs' Civil Rights Municipal Liability, 42 U.S.C. § 1893 as Stated Under Plaintiffs' Eighth Cause of Action*

Plaintiffs' Eighth Cause of Action alleges violations of 42 U.S.C. § 1983 by Utah County.  Defendants assert that there was no improper custom in place to support Plaintiffs' claims against Utah County, or its Sheriff's Department, and that the record regarding the Utah County Sheriff's Department's interactions with deaf or hearing impaired individuals demonstrates the Department is considerate of those individuals.

> Even if plaintiffs cannot identify an official policy of a municipality that directly caused a constitutional violation leading to their injuries, they may still be able to prove that the violation of their constitutional rights was occasioned by "the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."   There is a three-part test that plaintiffs in the Tenth Circuit must satisfy to prove that a municipality is liable under *Monell* based on custom. The plaintiff must prove: "(1) The existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the ... [municipality's] employees; (2) Deliberate indifference to or tacit approval such misconduct by the ... [municipality's] policymaking officials ... after notice to the officials of that particular misconduct; and (3) That the plaintiff was injured by virtue of the unconstitutional acts pursuant to the ... [municipality's] custom and that the custom was the moving force behind the unconstitutional acts."[55]

---

[55]    *See Brown v. Whitman*, 651 F.Supp.2d 1216, 1230 (D. Colo. 2009)(internal citations omitted).

Plaintiffs argue that Utah County, or its Sheriff's Department, is liable based on the customs of Utah County and its ratification of the "intentional denial of constitutional and statutory rights of its citizens." Plaintiffs, however, offer no proof approaching the level required to show a "persistent and widespread practice of unconstitutional misconduct."[56] The only evidence related to this claim is submitted by Utah County. The records from Utah County demonstrate that it is routine for hearing impaired individuals to have access to auxiliary aids, such as the TDD or TTY phones in the jail; and that the Utah County Sheriff's Office has addressed interactions with hearing impaired individuals on one or more occasions through interpreters.[57] In fact, Utah County showed that it spent thousands of dollars last year for interpreter services prior to these events.[58]

Plaintiffs' statements regarding Utah County's practices were unsupported and insufficient to show that Utah County is liable for Plaintiffs' alleged injuries on the basis of an unconstitutional custom. There is no evidence of an established policy, practice, custom and/or decision by Utah County to deprive Utah County Sheriff's Office deputies of proper training or hearing impaired citizens of auxiliary aids and services.

Plaintiffs failed to meet the requirements of *Brown v. Whitman*, to establish municipal liability and Plaintiffs' Eighth Cause of Action is dismissed.

---

[56] *Gates*, 996 F.2d at 1041.

[57] *See* Defendants Utah County, Officer Higley, and Sheriff Tracy's Supplemental Initial Disclosures, UC 0055-0456, excerpts of which are attached as Exh. C to the Supporting Memorandum.

[58] *See* Defendants Utah County, Officer Higley, and Sheriff Tracy's Supplemental Initial Disclosures, UC 0466, excerpts of which are attached as Exh. C to the Supporting Memorandum.

*viii.* *Plaintiffs' Claims Against Sergeant Higley for Violation of Plaintiffs Constitutional Right to be Free from Illegal Search and Seizure and Attached Due Process Violations Under the Fourth and Fourteenth Amendments and Section 1983 as Stated Under Plaintiffs' Sixth Cause of Action.*

Defendants assert that Sergeant Higley is entitled to summary judgment under the doctrine of qualified immunity.[59]   Officers are entitled to qualified immunity when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[60]   "Qualified immunity protect[s] officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."[61]

When such a defense is raised, it becomes the Plaintiffs' burden to first prove that the facts alleged make out a violation of a constitutional right.[62]   Then, the second prong of the qualified immunity inquiry turns on whether the right allegedly violated was clearly established at the time of the incident[63] "such that a reasonable person in the defendant's position would have known that his conduct violated that right."[64] "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."[65]

---

[59]     Plaintiffs concede that analysis should proceed under the Fourth Amendment regarding the officers' interactions with Plaintiffs.  *See* Plaintiffs' Opposition Memorandum, pg. 17.
[60]     *See Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow*, 457 U.S. at 818).
[61]     *See Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).
[62]     *See Pearson* at 816.
[63]     *See Graham*, 490 U.S. at 396.
[64]     *See Keylong v. City of Albuquerque,* 535 F. 3d. 1210, 1218 (10th Cir. 2008) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1007 (10th Cir. 2003)).
[65]     *See Saucier*, 533 U.S. at 202.

If the plaintiff "fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity."[66] The court has discretion as to which of these two inquiries it addresses first.[67]

In this case, the parties agree that "[T]he Fourth Amendment does not permit a warrantless entry into a suspect's home to arrest him unless the circumstances are exigent or an occupant has consented.[68] Furthermore, the parties agree that Schultz did not consent to the officers entering his home.

Defendants argued that Plaintiffs have not supported their "heavy burden" of establishing that the law was clearly established on these specific facts and that it would be appropriate for this court to find that (as of February 21, 2010) the "existing precedent" had not placed beyond debate theconstitutional question regarding the interactions with a hearing impaired individual, and subsequent entry into the apartment with use of minimal force, in a situation analogous to that confronting Sergeant Higley (such that "every reasonable official would have understood that what he [did] violate[d] that right").[69]

Defendants asserted that exigent circumstances existed under the emergency circumstances articulated by the U. S. Supreme Court in *Brigham City, Utah v. Stuart*.[70] In *Brigham City, Utah*, officers responded to a 3 a.m. call about a loud party and when outside they observed what they perceived to be an altercation through a kitchen window. They saw four adults attempting to restrain a juvenile, who broke free and struck one of the adults, causing him

[66]     *See Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003) (internal quotation marks omitted).

[67]     *See Pearson*, 129 S. Ct. at 818.

[68]     *See Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). *See also U.S. v. Vasquez*, 638 F.2d 507, 526 (2nd Cir. 1980) (internal citations omitted).

[69]     *See Kerns v. Bader*, 663 F.3d 1173, 1183 (10th Cir. 2011).

[70]     547 U.S. 398 (2006).

to spit up blood.[71]  When the officers saw the fight continue, they announced themselves through an open screen door, but no one heard, so they then entered the home and announced themselves again.  The entry was deemed reasonable because "the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning."[72] Further, the court found the "manner of the officers' entry was also reasonable" in spite of the Fourth Amendment "knock and announce" requirement, because no one heard the officer's announcement outside the screen door and the announcement after stepping inside "was probably the only option that had even a chance of rising above the din."[73]

Defendants claim that Sergeant Higley had just been confronted with a crime scene and a murdered, unidentified female victim.  Therefore, Defendants asserted, the gravity of the underlying offense was severe and that Sergeant Higley's actions in following Plaintiff Schultz into the apartment after Schultz turned away were reasonable because Sergeant Higley knew that he could not verbally command Plaintiff Schultz to stop since Plaintiff Schultz is Deaf.  According to Defendants, they had a reasonable belief that Plaintiff Schultz walked away to hide evidence, get a weapon, or try to flee.  This ignores the point of their interchange with Schultz which was pointed at seeing Schultz's wife.

Defendants also joined with Co-Defendants' analysis of *Ryburn v. Huff*[74] in Co-Defendants' Reply Memorandum.[75]  In *Ryburn v. Huff*, a minor was being interviewed for allegations that the minor may conduct violence against his fellow classmates and teacher.  The

---

71       *Id.* at 401.
72       *Id.* at 406.
73       *Id.* at 406-07*.*
74       132 S. Ct. 987 (2012).
75       Reply Memorandum in Further Support of Defendants Reed Vanwagoner's, Provo City's, and Chief David Bolda's Motion for Summary Judgment, docket no. 49, filed June 26, 2012.

interview took place in the presence of his mother on the sidewalk outside his home. The officers asked if they could interview the mother inside and she declined. Then when the officers asked if there were any guns in the home, the mother ran inside the home. The *Ryburn* court found that the discrete incident of the mother not responding and returning into the house, when considered under the totality of the circumstances, was the precipitating event that permitted the officers' entry inside the home in following the mother, without a warrant. The Plaintiffs stated, unlike *Brigham City, or Ryburn,* Defendants in this case had not shown any predicate reason for the officers to suspect the presence of a weapon or to believe that Plaintiff intended to destroy evidence.

Unlike the exigent circumstances present in *Brigham City, Utah* and *Ryburn*, the facts in this case only show that Plaintiff Schultz was deaf and turned away from the officers and that he was complying with the officers' demand to see his wife. This does not create exigent circumstances, authorizing entry into the home without consent. No exigency is presented by the events leading up to Sergeant Higley's interactions with Plaintiff Schultz, since the victim was already dead and discovery was made several hours before. There are no exigencies comparable to those enumerated in *Welsh v. Wisconsin*[76] which included the "hot pursuit of a fleeing felon," "destruction of evidence" or "ongoing fire.". Further, while Defendants assert that there is no ,Tenth Circuit or Supreme Court decision on these facts the law clearly established that warrantless entries are not permitted absent exigent circumstances. No such circumstances were present.

---

[76] 104 S.Ct. 2091, 2097, 2099 (1984).

As a result, on the undisputed facts presented on this motion, Sergeant Higley is not entitled to qualified immunity. Accordingly, dismissal of Plaintiffs' Sixth Cause of Action against Sergeant Higley is denied.

**C.  Plaintiffs' Claims Against Officer Reed Van Wagoner, Provo City, and David Bolda, Interim Provo City Police Chief**

*i.      Plaintiffs' Claims Against Officer Reed Van Wagoner*

Officer Reed Van Wagoner ("Lt. Van Wagoner") asserts that he is entitled to dismissal of the civil rights claims against him on the basis of qualified immunity.

In support of his motion for summary judgment, Lt. Van Wagoner presented sworn testimony establishing that he did not participate in the conversation between Sergeant Higley and Mr. Schultz; that he made no independent assessment of exigent circumstances allowing for warrantless entry into the Schultz/Skaggs apartment; that he did not have information upon which to make an independent probable cause determination; and that he followed Sergeant Higley into the apartment to provide backup. Plaintiffs do not contest these material facts.

Plaintiffs have failed to provide any evidence to contradict the sworn testimony of Officer Van Wagoner. Plaintiffs have also failed to sustain their burden to demonstrate that it was clearly established that a reasonable person in Officer Van Wagoner's position would have known that his conduct in entering the apartment to provide backup violated Plaintiffs' constitutional rights. Accordingly, the court finds that Officer Van Wagoner is entitled to qualified immunity and hereby dismisses Plaintiffs' claims against him.

*ii.     Plaintiffs' Claims Against Provo City and Chief Bolda*

Against Provo City and Chief Bolda, Plaintiffs claim that the events of the evening were the direct result of failure to train or supervise Officer Van Wagoner. All of the parties agree, however, that the "welfare check" at the Schultz/Skaggs apartment was being conducted

pursuant to orders from the Utah County Sheriff. Thus, it is Utah County policy that is at issue in this case.  Provo City policies are not implicated because it was not directing the investigation. Thus, Plaintiffs cannot establish that Provo City policy was the "moving force" behind the alleged civil rights violation. Similarly, Provo City's police are not implicated in Plaintiffs' ADA claims.  Accordingly, Plaintiffs' claims against Provo City and Chief Bolda are hereby dismissed.

## ORDER

Having reviewed the parties' respective motions and memoranda, each document submitted before the court, the applicable case law and statutory provisions, the arguments of counsel set forth at the March 18, 2013 hearing, and based on consideration of facts deemed relevant by the court and notes addressed at the hearing included above, for good cause appearing, IT IS HEREBY ORDERED that:

I.      Defendants' Motion for Summary Judgment[77] is GRANTED in part and DENIED in part as follows:

     i.      Defendants' Motion for Summary Judgment on  Plaintiffs' First Cause of Action (Injunction and Damages for Violation of Title II of the ADA Failure to Afford Effective Communication Against Utah County and Provo City) is GRANTED.

     ii.     Defendants' Motion for Summary Judgment on Plaintiffs' Second Cause of Action (Violation of Section 504 of the Rehabilitation Act Against Utah County and Provo City) is GRANTED.

     iii.    Defendants' Motion for Summary Judgment on  Plaintiffs' Third Cause of Action (Violation of Title II, ADA and Section 504 – Disparate Treatment by Reason of Disability, Against Utah County and Provo City) is GRANTED.

     iv.     Defendants' Motion for Summary Judgment on  Plaintiffs' Fourth Cause of

---

[77] Docket no. 33, filed March 8, 2012.

Action (Violation of Title II, ADA – Discriminatory Policies, Practices and Procedures, Against Utah County) is DENIED.

v.      Defendants' Motion for Summary Judgment on  Plaintiffs' Fifth Cause of Action (Injunction and Damages for Violation of Title II, ADA–Discriminatory Administrative Methods Against Utah County) is DENIED.

vi.     Defendants' Motion for Summary Judgment on  Plaintiffs' Sixth Cause of Action (Injunction and Damages for Violation Plaintiffs Constitutional Right to be Free from Illegal Search and Seizure and Attached Due Process Violations Under the Fourth and Fourteenth Amendments and Section 1983 Against All Individual (Non Municipal) Parties In Their Official Capacities) is DENIED.

vii.    Defendants' Motion for Summary Judgment on  Plaintiffs' Seventh Cause of Action (Injunction and Damages for Violation Plaintiffs Constitutional Rights to Miranda Prior to Custodial Questioning and Attached Due Process Violations Under the Sixth and Fourteenth Amendments Against All Individual Parties (Non Municipal) In Their Official Capacities) is GRANTED.

viii.   Defendants' Motion for Summary Judgment on  Plaintiffs' Eighth Cause of Action (Violation of the Plaintiffs' Civil Rights Municipal Liability, 42 U.S.C. §1983 Against Defendants Utah County and Provo City) is GRANTED.

ix.     Defendants' Motion for Summary Judgment on  all claims of the Utah Association of the Deaf (the "UAD") is GRANTED.  UAD is no longer a party to this case.

x.      Defendants' Motion for Summary Judgment on all claims in their entirety w against Jim Tracy, Utah County Sheriff is GRANTED with prejudice.  Jim Tracy, Utah County Sheriff, is no longer a party to this case.

II.     Co-Defendants' Motion for Summary Judgment[78] is GRANTED in its entirety

---

78 Docket no. 45, filed May 22, 2012.

and Plaintiffs' claims and legal action against Lieutenant Reed VanWagoner, Provo City, and David Bolda are dismissed with prejudice.

DATED this 19th day of August, 2013.

BY THE COURT:

_____
DAVID NUFFER
U.S. DISTRICT JUDGE